UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | |
|---|---|
| In re:<br><br>BRITESTARR HOMES, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No.: 02-50811 (AHWS) |

**JOINT MOTION TO EXTEND THE TIME
FOR A CLOSING UNDER BRITESTARR HOMES, INC.'S
CONFIRMED SECOND AMENDED PLAN OF REORGANIZATION**

Britestarr Homes, Inc. ("BHI"), by and through its attorneys, Ivey, Barnum & O'Mara, LLC and Oak Point Property LLC ("OPP"), by and through its attorneys Coan, Lewendon, Gulliver & Miltenberger, LLC, hereby move the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division (the "Court") for an order extending the time to close under the provisions of BHI's confirmed Second Amended Plan of Reorganization and remain under the protection of this Court. In support of their motion, BHI and OPP allege as follows:

**The Confirmation of the Plan**

1. On June 29, 2004 (the "Confirmation Date"), BHI confirmed its Second Amended Plan of Reorganization (the "Plan") providing that BHI would transfer its 27 acres of real estate located in the Bronx, New York (the "Property") to OPP free and clear of all liens and encumbrances.

2. The Plan resolved BHI's issues with its largest non-governmental creditors, and was designed to provide BHI with an opportunity to resolve its issues with its two largest governmental creditors, the New York City Department of Finance (the "City") and the New York State Department of Environmental Conservation.

3.  The Plan provided BHI a period of 270 days (subject to extensions by the Court) to resolve its issues with the City and the State of New York and to receive the financing necessary to make the payments required by the Plan and transfer the Property to OPP. In the event that BHI failed to transfer the Property within the period provided, the Property is to be auctioned under the auspices of this Court.[1]

4.  BHI and OPP believed that the 270 day period was sufficient to close under Plan in large part because all parties in interest had voted in favor of BHI's Plan, and both New York City and the State of New York indicated a willingness to work cooperatively with BHI. Thus, the City advised this Court on the Confirmation Date that --

> I will add likewise, like Mr. Wynn [counsel to the State of New York], that we do continue to hope that there is a settlement between the City and the debtor. The parties are negotiating.
>
> At this point there's no definitive agreement between the parties, but the plan does provide for, I believe, 60 days to object to the claim and hopefully, we will have things resolved by that time.

*Comments of Counsel to New York City, Transcript of Proceedings of June 29, 2004*, at p. 16-17.

---

[1] Specifically, the Plan provides that BHI would transfer the Property on the "Closing Date." The Plan defines the "Closing Date" as follows:

> the first date on which (a) the order confirming this Plan is a Final Order, (b) all of the Claims against the Debtor's estate are Allowed by the passage of time or the entry of a Final Order, (c) and the Debtor and/or the Successor has a remediation plan approved by the State of New York's Department of Environmental Conservation.

*See Plan*, at ¶ 7.4. The term "closing" or "Closing Date" used in this motion is the "Closing Date," as defined in the Plan, and as extended by this Court.

5. Although a simple tax settlement with the City was reached quickly other issues emerged. Significantly, the New York City Economic Development Corporation began to indicate that it desired six (6) acres of the Property for free for the site of a proposed jail, the new Bronx House of Detention.

6. Faced with the Plan's deadline to object to proofs of claim about to expire, BHI objected to the City's claims and sought a determination of the bankruptcy estate's tax liability under 11 U.S.C. § 505.

7. Subsequently, the City agreed to a mediation of the issues between it and BHI. The City then consented to a motion to extend the time to close under the Plan until 180 days after the conclusion of the mediation.

### The Mediation and the Efforts to Development the Property

8. On February 1, 2005, this Court entered an order referring all the issues between the City and BHI to mediation. The mediation continued for 672 days. The negotiations that took place in the mediation are confidential pursuant to orders of this Court.

9. From 2004 to 2006, OPP and its affiliates strove to develop a power plant on the Property. OPP and its affiliates entered into agreements with Keyspan Energy to respond to a request for proposals by the New York Power Authority. Keyspan offered to pay OPP $42 million *for a 13-acre portion* of the Property (the balance of the Property to be made available to the City).

10. Upon information and belief, in December 2005, the City decided that it would be politically unpalatable to construct its jail next to a power plant. Upon further information and belief, the City commenced a series of public and private disclosures regarding its intentions for the Property

and this discouraged the efforts of Keyspan (and its assignee) to develop the power plant on the Property.

11.     The loss of the power project forced BHI to seek to develop the Property for other commercial purposes. This caused significant delay, and potentially limited the value of the Property for the bankruptcy estate and its constituencies.

12.     In November 2006, after over 600 days of mediation and negotiation, the City and BHI agreed to a monetary settlement of the City's tax claim and to a period in which BHI could close under the Plan (the "2006 Settlement Agreement"). The 2006 Settlement Agreement specifically provided for the following:

> 1. Amount and Payment of Claim. Upon the Closing Date (as defined in the Plan), BHI shall pay $3 million to NYC;
>
> 2. Satisfaction and Release of Claims. Upon the payment set forth in paragraph 1 above, NYC will release all of the NYC Claims with respect to the Property . . .
>
> 6. Assistance in Confirmation and Implementation of the Plan. NYC shall use all reasonable efforts to assist BHI in satisfying the conditions of the Closing Date as set forth in the Plan, and in otherwise implementing the provisions of the Plan, *provided however*, that nothing in this paragraph shall require NYC to waive any right that it has under the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure, or under the terms of the Plan. . . .

> 20. <u>Conclusion of Mediation</u>. The mediation with the Honorable Milton Mollen will conclude upon the entry of a final, non-appealable order approving this agreement.

13. Importantly, the settlement provided that the City's agreement to reduce its tax claim (currently over $30 million) to $3 million is *conditional* on BHI and OPP "Closing" under the Plan. *See 2006 Settlement Agreement*, at ¶¶ 1 and 2. The City's tax $30 million tax claim is not reduced if the Property is auctioned pursuant to the Plan.

14. Further, the November 2006 Settlement Agreement re-commenced the time period in which the closing was required to occur. *See 2006 Settlement Agreement*, at ¶ 20, and *Order Approving Enlargement of Time to Satisfy Conditions Precedent to the Closing Date*, Document I.D. 449. These provisions were acceptable to BHI and OPP because the City agreed to "*use all reasonable efforts* to assist BHI in satisfying the conditions of the Closing Date as set forth in the Plan," 2006 Settlement Agreement, at ¶ 6 (emphasis added) and because OPP had arranged two independent means of financing the Plan.

### The Adversary Proceeding With the City

15. On February 8, 2007, the City issued a public notice of its intention to take the *entire* Oak Point Property. On that date, the City published a notice in the *New York Post* under the heading "Positive Declaration and Public Scoping." Unlike the City's previous statements that it might acquire a portion of the Property for a jail, the official public notice and documents simultaneously posted on the City website made it plain that the City might take the entire Property.

16. On April 11, 2007, BHI and OPP commenced an adversary proceeding alleging that the City breached its agreement to "use all reasonable efforts to assist BHI in satisfying the conditions

5

of the Closing Date as set forth in the Plan." See *Britestarr Homes, Inc., et al. v. The City of New York*, Adversary Proceeding No. 07-5020 (AHWS).

17. On April 8, 2008, this Court approved a second settlement (the "2008 Settlement Agreement") between BHI and NYC. Under this settlement, BHI is to pay the City the sum of $1.5 million on the Closing Date under the Plan.

18. The 2008 Settlement Agreement contemplates a closing under the Plan between BHI and OPP on or before December 31, 2008. If no closing occurs by that date, then interest begins to accrue on the $1.5 million payment to the City at the rate of 18% per annum compounded daily.

19. As with the 2006 Settlement, the the City's agreement to reduce its tax claim is conditional on BHI and OPP "Closing" under the Plan. The City does not waive its more than $30 million claim if there is no Closing under the Plan and the Property is instead auctioned pursuant to the Plan.

20. Also on April 8, 2008, this Court extended the deadline to Close the transaction contemplated by the Plan up to and including December 31, 2008.

**The Recent Efforts to Finance and Close the Plan**

21. After reaching the 2008 Settlement Agreement, BHI commenced an extensive cleanup of the Property in furtherance of its obligation to remediate environmental conditions and to allow a portion of the Property to be rented and generate income.

22. As a result of this work and marketing of the property, BHI now has sufficient cash flow to pay its current and future (including debt service) expenses.

23. Furthermore, since the approval of the 2008 Settlement Agreement, OPP teamed

up with Pantheon Properties, a NYC based developer of industrial properties to market the property and solicit financing. Pantheon has provided capital towards the reorganization, and has made diligent efforts to secure debt financing. However, in September 2008, the global debt markets essentially seized.

24. In November 2008, BHI and OPP retained Samuel A. Ramirez & Company, Inc, a premier investment banking firm with close ties to the Bronx business community, to solicit equity financing to fund the Plan. Ramirez & Company has also committed financing in its own right, and which is working aggressively to obtain additional investors and purchasers to finance the closing.

25. BHI is also negotiating with Consolidated Edison, which is seeks to acquire a natural gas pipeline easement on the Property. The easement to be granted to Consolidated Edison will yield approximately $1.5 million to help finance the Plan.

26. Nevertheless, BHI and OPP have yet obtained sufficient financing to close under the Plan. The overall condition of the banking industry and financing institutions has made financing of the Plan more difficult than could ever have been foreseen in April of 2008. The *New York Times* refers to the current economic environment as a "credit crisis" that has caused the federal government to takeover or "rescue" such financial giants Bear Stearns, Fannie Mae, Freddie Mac, American International Group, and Citicorp.

27. BHI, OPP, and the Property are located at ground zero of this credit crisis, New York City. Additional difficulty in financing arose from New York State's and New York City's Department of Transportations intention to purchase the Property to avoid condemnation.

28. Accordingly, despite their best efforts, BHI and OPP have been unable to raise

sufficient financing to close under the Plan.

### The OPP's Intention to Auction the Property and "Close" Under the Plan

29. BHI's bankruptcy estate will realize the benefits of the 2008 Settlement Agreement and OPP's environmental remediation plan if there is a "Closing" under the Plan, but not otherwise. In the absence of a Closing under the Plan, the Debtor is required to conduct a bankruptcy auction of the Property under the auspices of this Court, and the City will be entitled to the full amount of its secured tax claim, an amount that now exceeds $30 million. The benefits of OPP's remediation agreement with the NYS-DEC will also be lost in the absence of a Closing under the Plan.

30. In current economic climate, BHI and OPP believes it is unlikely that a bankruptcy auction of the Property will generate sufficient funds to pay even the City's secured tax claim. However, a properly advertised and structured public auction will almost certainly generate sufficient funds to pay the City's tax claim settlement ($1.5 million plus interest), to pay the first mortgage in full, to fund the NYS-DEC's required escrow for OPP's environmental remediation ($3.0 million), and to pay the unsecured creditors with interest.

31. In the absence of a Closing under the Plan before then, BHI and OPP will auction the Property on May 31, 2009. If the auction generates sufficient funds to finance the Closing under the Plan, the Property will be transferred to OPP and then to the successful bidder. In this manner, the auction will be used to finance the Plan.

32. Allowing for such an auction provides creditors with the greatest possibility of recovery for unsecured creditors and also provides for the ultimate resolution of the bankruptcy case. Unless the auction funds the Closing under the Plan, it must yield much more than $30

million to pay unsecured creditors any money whatsoever. However, an auction that finances the Closing under the Plan will pay unsecured creditors in full with a with a successful bid of approximately $12 million.

33. If the auction does not generate sufficient proceeds to Close under the Plan, then there will be no "Closing" and BHI will transfer the Property directly to the successful bidder and distribute the proceeds in the manner contemplated by the Plan. The BHI bankruptcy case will then come to an end.

34. Prior to the hearing on this motion, BHI and OPP will have filed a "Motion Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 6004 and the Terms of the Debtor's Confirmed First Amended Plan of Reorganization for (I) Approval of Procedures in Connection with the Sale the of All of the Debtor's Assets, (II) Authorization to Enter into Stalking Horse Agreements, (III) Approval of Payment of Stalking Horse Protections, and (IV) the Setting of Auction and Hearing Dates" (the "Auction Motion").

35. The Auction Motion establishes a time table for the proposed auction and bid procedures. Unless closing funds are raised before then, the Auction Motion calls for an auction on May 31, 2009 and a closing on or before July 30, 2009.

36. Because the Property is subject to environmental issues and associated remediation order in favor of the Department of Environmental Protection, a reasonable time in needed for potential bidders to investigate the Property. BHI and OPP will establish an on-line archive of documents related to the Property for review by potential bidders. As set forth in the Auction Motion, any bidder that agrees to traditional confidentiality safeguards will have access to these materials.

37.	BHI and OPP are in discussions with several parties in an effort to obtaining a stalking horse buyer. BHI and OPP do not seek to delay the auction until a stalking horse bidder is identified, but have provided a mechanism for providing traditional protections for a potential stalking horse bidder, if one is secured.

38.	BHI and OPP contend that the auction process set forth in the Auction Motion and a concurrent extension of the deadline to close the transaction contemplated by the Plan provide the BHI bankruptcy estate with the greatest possibility of making a significant distribution to its creditors.

WHEREFORE, Britestarr Homes, Inc. and Oak Point Property respectfully request an extension of the deadline to close the transaction contemplated by Britestarr Homes, Inc.'s Second Amended Plan of Reorganization.

Dated at Greenwich, Connecticut this 11th day of December, 2008.

    Respectfully submitted,

    BRITESTARR HOMES, INC.

    By:   /s/ Melissa Zelen Neier
        Melissa Zelen Neier, Esq.
        Federal Bar No.: ct25055
        Kent C. Kolbig, Esq.
        Federal Bar No.: ct26756
        Ivey, Barnum & O'Mara, LLC
        170 Mason Street
        Greenwich, CT 06830
        Telephone: (203) 661-6000
        Facsimile: (203) 661-9462
        E-mail: mneier@ibolaw.com
        E-mail: kkolbig@ibolaw.com


    OAK POINT PROPERTY, INC.

    By:   /s/ Timothy D. Miltenberger
        Timothy D. Miltenberger, Esq.
        Federal Bar No.: ct08874
        Coan, Lewendon, Gulliver &
         Miltenberger, LLC
        495 Orange St.
        New Haven, CT 06511
        Telelphone: (203) 624-4756
        Facsimile: (203) 865-3673
        E-mail: Tmiltenberger@coanlewendon.com