UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | |
|---|---|
| In re:<br>BRITESTARR HOMES, INC.,<br>Debtor. | : Chapter 11<br>:<br>:<br>: Case No. 02-50811<br>:<br>: |

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363 AND 365
OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 6004
AND THE TERMS OF THE DEBTOR'S CONFIRMED FIRST
AMENDED PLAN OF REORGANIZATION FOR (I) APPROVAL OF
PROCEDURES IN CONNECTION WITH THE SALE THE OF ALL OF THE
DEBTOR'S ASSETS, (II) AUTHORIZATION TO ENTER INTO STALKING HORSE
AGREEMENTS, (III) APPROVAL OF PAYMENT OF STALKING HORSE
PROTECTIONS, AND (IV) THE SETTING OF AUCTION AND HEARING DATES**

The Debtor, Britestarr Homes, Inc., by and through its attorneys Ivey, Barnum & O'Mara, LLC, hereby files this motion for (i) approval of procedures in connection with the sale the of all of the debtor's assets, (ii) authorization to enter into stalking horse agreements, (iii) approval of payment of stalking horse protections, and (iv) the setting of auction and hearing dates. In support of its motion, the Debtor states as follows:

**Preliminary Statement**

1.     On May 20, 2002, the Debtor filed for relief under chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

2.     On June 29, 2004, this Court confirmed the Debtor's First Amended Plan of Reorganization (the "Plan") that called for the Debtor's real property to be transferred to Oak

1

Point Property, LLC (the "Successor") on a "Closing Date," as that term is defined by the Plan. In the absence of a closing, the Plan calls for an auction of the Debtor's real estate and a distribution of the proceeds of that auction in accordance with the distribution provisions of chapter 7 of the United States Bankruptcy Code.

3. Over the course of the last several years, the Debtor and the Successor have attempted to raise the capital sufficient to effect a closing under the Plan. As of the date of this motion, these efforts have not succeeded. Currently, the Debtor must close under the Plan by December 31, 2008. Otherwise, under the terms of the Plan, the Debtor must auction off its real estate. The Debtor has filed a request for additional time to close. In addition, in its prior motion the Debtor has sought authority to use the proceeds of the auction contemplated by this motion to fund a closing under the plan, if the auction generates sufficient proceeds to "close" under the Plan.

4. The Debtor now seeks an order to set procedures for an auction of the Debtor's real estate. If the proceeds are insufficient to close under the Plan, then the proceeds of the auction will be distributed in accordance with the distribution provisions of chapter 7 of the United States Bankruptcy Code as required by the Plan. In either event, the auction contemplated hereby will resolve all of the outstanding issues in this bankruptcy case.

## Background

5. On the Petition Date, the Debtor sought relief under chapter 11 of the United States Bankruptcy Code. On that date, the Debtor had no money and its management had resigned from office. On the Petition Date, the Debtor owed over $11 million in real estate taxes,

and was subject to a compliance order in favor of the New York State Department of Environmental Conservation requiring a multi-million dollar remediation of the Debtor's real property.

6. An official committee of unsecured creditors (the "Creditors Committee") has been appointed in this bankruptcy case.

### The Debtor's Real Estate

7. Britestarr's most valuable asset is the Oak Point Property. On July 26, 2001, Cushman and Wakefield of Connecticut, Inc. ("Cushman and Wakefield") conducted a complete appraisal of this property for ABB Equity Ventures, Inc. ("ABB"). This appraisal placed a value on the Property of approximately $17 million in fee-simple. Subsequently, a realty company named Freedland Realty advised the Debtor, that the Oak Point Property was worth approximately $1 million per acre, or slightly over $20,000,000.

8. With a zoning designation of M3-1, the Oak Point Property is an attractive site for the construction of "heavy-industrial" projects, such as an electric generating facility. New York City's Waterfront Revitalization Program, authorized by the Federal Coastal Zone Management Act of 1972 and the New York State Waterfront Revitalization and Coastal Resources Act of 1981, has designated the area in which the Property is located as a "Significant Maritime and Industrial Area". Industrial and manufacturing uses are specifically cited in the relevant zoning provision as a permitted use "as of right" and in Waterfront Revitalization Policy as a type of activity that should be supported and encouraged in a "Significant Maritime and Industrial Area."

9.  The Oak Point Property is situated within an existing heavy-industrial area that is buffered from residential areas by a railway (CSX) and a major elevated highway (Bruckner Expressway). In addition, there are no sensitive receptors such as; public schools, hospitals, or recreation facilities located in close proximity to the site. It is adjacent to existing natural gas pipelines and electric transmission lines, has deepwater portage and abuts a working rail yard. The Oak Point Property benefits from being located within a federally recognized "Empowerment Zone" and a State and City "Economic Development Zone."

## Jurisdiction and Venue

10.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

11.  By this motion, the Debtor seeks the entry of two orders:

(i)  The Debtor requests the entry of an order on an expedited basis, substantially in the form attached hereto as Exhibit "A" (the "Bidding Procedures Order") (A) approving procedures (the "Bidding Procedures," the form of which is attached hereto as Exhibit "B"), for (i) submitting bids for any or all of the Debtor's real estate, (ii) conducting the auction (the "Auction") with respect to the Debtor's real estate, (B) authorizing, but not requiring, the Debtor to (i) enter into a "stalking horse" agreement (a "Stalking Horse Agreement") with a bidder or bidders (a "Stalking Horse Bidder") for the purpose of establishing a minimum acceptable bid at which to begin the Auction; (ii) provide any Stalking Horse Bidder with a fee (the "Termination Fee") of up to two percent (2%) of the purchase price set forth in any Stalking Horse Agreement; and (iii) enter into an agreement (an "Expense Reimbursement Agreement") with one or more entities that submit bids to provide for the reimbursement of reasonable costs and expenses incurred by such entity in connection with its bid (the "Expense Reimbursement," and together with the Termination Fee, the "Stalking Horse Protections"); and C) scheduling the Auction

4

and a hearing to approve any such sale (the "Sale Approval Hearing") with respect to any bid(s) accepted by the Debtor for a date certain.

(ii) At the sale approval hearing, the Debtor will request entry of an order, pursuant to sections 105(a) and 363(b), (f), and (m), and Bankruptcy Rules 6004 and 9014, and the terms of the Plan that approves either or both of (A) the Asset Purchase Agreement (defined below), and (B) the Asset Sale (defined below). A copy of the proposed order approving the Asset Purchase Agreement (the "APA Order") is attached hereto as Exhibit "C".

### Proposed Notice, Bidding and Auction Procedures

**I.    Notice and Other Procedures**

12.  The Debtor requests approval of the following notice and other procedures:

(1) <u>Sale Notice</u>: On or before February 2, 2009, the Debtor will serve notice of the Auction and Sale Approval Hearing (the "Sale Notice") by first class mail on (I) the Office of the United States Trustee for the District of Connecticut (the "UST"); (ii) counsel for the secured creditors the City of New York and Galea & Kruse (together, the "Secured Lenders"); (iii) counsel to the Creditors Committee, and (iv) all known creditors of the Debtor. A copy of the form Sale Notice is attached hereto as Exhibit "D".

(2) <u>Date, Time, and Place of Auction</u>: The Debtor proposes that the Auction be conducted at the United States Bankruptcy Court, Room 123, 915 Lafayette Boulevard, Bridgeport, Connecticut commencing on May 29, 2009 at 10:00 a.m.. The Debtor's real estate may be sold in a single sale to a single offeror or in parts to different offerors. The Debtor will select the highest or best bid(s) after consultation with counsel to the Creditors Committee at the conclusion of the Auction and the successful bidder(s) (the "Successful Bidder") will be required to enter into definitive agreements, which shall be subject to the approval of this Court at the Sale Approval

Hearing. The Auction may be adjourned by announcement at the Auction and the entry of an appropriate order of the Court. Following the conclusion of the Auction, the Debtor will promptly file a notice with the Court identifying the Successful Bidder(s).

(3) <u>Date, Time and Place of the Sale Approval Hearing</u>: The Debtor proposes that the Sale Approval Hearing be held in the United States Bankruptcy Court, Room 123, 915 Lafayette Boulevard, Bridgeport, Connecticut on June 9, 2009 at 10:00 a.m. or such other date and time as the Court may direct. The Sale Approval Hearing may adjourned without further notice by announcement at the Sale Approval Hearing.

(4) <u>Objection to the Sale Order(s)</u>: Objections to the relief requested in the Sale Order shall be in writing, filed, and served so that they are <u>actually received</u> by (i) the Debtor's counsel, (ii) the Secured Creditors' counsel, (iii) the Creditor's Committee counsel, and (iv) the UST by June 4, 2009. As soon as practicable after the Auction, but no later than before the Sale Approval Hearing, the Debtors will file a final form of Sale Order and/or Agency Order as agreed upon by the Debtor and the Successful Bidder(s).

(5) <u>Information to Be Provided to Interested Parties</u>: The Debtors either have provided or will provide to all parties that have either expressed an interest in purchasing the Debtor's real estate (and "Interested Party"), certain information in connection with the proposed Sale, including, without limitation, the proposed Bidding Procedures. Should any Interested Party desire additional or further information, such Interested Party will be required to enter into a confidentiality agreement acceptable to the Debtor in its business judgment. Upon execution of the

confidentiality agreement, the Interested Party will be given access (through a virtual data room or otherwise) to various relevant and confidential information.

(6) <u>Good Faith Deposit</u>: Bidders will be required to submit a good faith deposit (the "Good Faith Deposit") with the Debtor on or before May 25, 2009 at 4:00 p.m. (Eastern Standard Time) (the "Bid Deadline"). Such Good Faith Deposits shall be equal to five percent (5%) of the purchase price of such bid. Good Faith Deposits of all bidders (except for the Successful Bidder(s)) shall be held in a separate interest-bearing account for the Debtor's benefit until eleven (11) days following the Sale Approval Hearing. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtor will have no obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall become irrevocably become property of the Debtor's estate.

## II.    **The Bidding Process**

13.    The Debtor intends to implement the Bidding Procedures attached hereto as <u>Exhibit "B"</u>. The Debtor reserves the right to modify such procedures as necessary or appropriate, in consultation with counsel for the Creditors Committee to maximize value for the Debtor's estate and its creditors. The Debtor believes that the Bidding Procedures are appropriate and will maximize the recovery for the Debtors and their estates in connection with the Sale.

14.    The Debtor further believes that these Bidding Procedures provide an appropriate framework for selling the Debtor's real estate in a uniform fashion and will enable the Debtor and

the Creditors Committee to review, analyze, and compare all bids received to determine which bid(s) are in the best interest of the Debtor, its estate, and its creditors.

**III.    The Auction**

15.    The Debtor proposes that on May 29, 2009 at 10:00 a.m. (Eastern Standard Time) it will commence the Auction to sell all of its real estate. Any bidder who submits a Qualified Bid (as defined in the Bidding Procedures) may participate in the Auction. During the Auction, the Debtor will accept bids for all of its real estate, or one acre parcels of its real estate.

16.    Bidding will continue with respect to the Auction until the Debtor determines that it has received the highest or otherwise best bid(s) for it real estate. After the Debtor so determines, it will close the Auction, subject, however, to its right to re-open the Auction if necessary. The Debtor, after consultation with the Creditors Committee, will then determine and announce which sale or combination of sales has been determined to be the highest or otherwise best bid(s) (the "Successful Bid(s)").

17.    In determining which bid is the Successful Bid, the Debtors will consider the net return after payment of all costs and expenses associated with the transfer of its real estate, provided however, that economic criteria shall not be the sole criteria upon which the Debtor may base its decision and the Debtor shall take into account all factors it believes to be relevant in the exercise of its business judgment.

**IV.    Stalking Horse Agreement and Protections**

18.    The Debtor believes that in order to entice potential bidders to establish a floor price for the Debtor's real estate and the terms of such offer, it should be authorized, in its sole discretion,

8

after consultation with the counsel for the Creditors Committee, to enter into a Stalking Horse Agreement, and to offer any Stalking Horse Bidder a fee (a "Termination Fee") in the event that such bidder is ultimately outbid at the Auction. The Debtor further requests that this Court authorize the Debtor to, in its sole discretion, after consultation with counsel to the Creditors Committee, pay a Termination Fee of up to two (2%) of the purchase price set forth in any Stalking Horse Agreement. In no event shall such Termination Fee be payable if the Stalking Horse Agreement contains a "due diligence," board approval, or financing contingency. A Stalking Horse Agreement must provide that such bid shall remain open until the consummation of any other bid(s) that is selected as the Successful Bid(s).

19. In addition, the Termination Fee shall only be paid by the Debtors if the Stalking Horse bidder is not the Successful Bidder at the Auction and a transaction closes with another Successful Bidder for the assets covered by the Stalking Horse Agreement.

20. As an additional incentive to bid on the Debtor's real estate, the Debtor also seeks authorization to, after consultation with counsel for the Creditors Committee, enter into an agreement (the "Expense Reimbursement Agreement," and together with the Termination Fee, the "Stalking Horse Protections"), with one or more entities that submit bids to provide for the reimbursement of reasonable costs and expenses incurred by such offeror in connection with its bid (the "Expense Reimbursement").

21. Any Stalking Horse Bid will be subject to higher or better offers. In the event that the Debtors enter into a Stalking Horse Agreement, the Debtors shall (i) promptly file a notice with the

Court that includes a copy of any such agreement, and (ii) provide such agreement to any Interested Parties.

### Applicable Authority

23. Ample authority exists for the approval of the proposed sale of the Debtor's real estate. Section 363 of the United States Bankruptcy Code, which authorizes a debtor to use or sell assets fo the estate other than in the ordinary course of its business, free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of its business, property of the estate...

*See* 11 U.S.C. § 363(b)(1); Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or public auction.")

24. The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the Debtor. *See e.g. In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Security Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir 1983); *In re Adelphia Communications Corp.*, , No. 02-41729 (REG) (Bankr.S.D.N.Y. 2002). *See also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Smith v. VanGorkam*, 488 A.2d 858, 872 (Del. 1985)("the 'business judgment rule' is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company," which has continued applicability in bankruptcy.)

25.  In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Official Committee of Sub. Bondholders v. Integrated Res., Inc.*, 147 B.R. 65, 656 (S.D.N.Y. 1990)(holding that the business judgment rule has "vitality by analogy" in chapter 11). Once a court is satisfied that there is a sound business justification for a proposed sale, the court must then determine whether (i) the debtor-in-possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Betty Owens Sch.*, 1997 U.S.C. Dist. Lexis 5877 (S.D.N.Y. 1997).

26.  Ample business justification exists for the Sale in this case. To date, the Debtor's efforts to close under the Plan have failed. Accordingly, the Plan will soon require an auction sale of the Debtor's real estate. Approving an auction that conforms with process outlined herein will only increase the possibility that unsecured creditors will receive a distribution on account of their claims. The proposed Bidding Procedures will ensure that the Debtor and its estate will receive the maximum value for its real estate. The Debtor believes that the Sale must be completed in accordance with the time frame described herein to maximize participation at the Auction and maximize the amount of the Bids.

**II.   Sale of Assets Free and Clear of Liens, Claims and Encumbrances**

27.  In the interest of attracting the best offers, the sale of assets should be free and clear of any and all liens, claims, encumbrances, and interests in accordance with section 363(f) of the United

11

States Bankruptcy Code, with any such liens, claims, encumbrances, or interests attaching to the proceeds of the Sale. Pursuant to section 363(f) of the United States Bankruptcy Code, a debtor in possession may sel property of the estate "free and clear of any interest in such property other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;
- such entity consents;
- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all such liens on such property;
- such interest is in bona fide dispute; or
- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) - (5).

28.     With respect to any party asserting a lien, claim, encumbrance or interest against or in the Debtor's real estate, the Debtor anticipates that it will be able to satisfy one or more of the conditions satisfied in section 363(f).

29.     The Debtor owes far more than $20 million in real estate taxes. However, if the Auction results in a sum of money sufficient to "close" under the Plan, the Debtor may satisfy this obligation with a payment of $1.5 million. Similarly, if the Auction results in a sum of money sufficient to "close" under the Plan, the Debtor may satisfy the claims and interest of New York State's Department of Environmental Conservation by placing $3 million into escrow and insuring performance of the site closure agreement approved by this Court.

12

30. Importantly, all parties asserting a lien, claim, encumbrance or interest against or in the Debtor's real estate have consented to the sale free and clear. All parties with an interest in the Debtor's real estate voted for, and are bound by, the Plan. The Plan contemplates "an auction conducted pursuant to orders of the Bankruptcy Court," *see Plan* at ¶ 7.4, as contemplated herein.

31. Accordingly, the Debtor anticipates that there will be a sale of its real estate free and clear of liens, claims, encumbrances, and interests that will satisfy the statutory requirements of section 363(f) of the United States Bankruptcy Code.

### III. The Successful Offeror Should Be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

32. Section 363(m) of the United States Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

1 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those oders and judgments upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130 *9 (S.D.N.Y. 1993)(quoting *In re Abbots Dairies of Penn., Inc.*, 788 F.2d 143, 147). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr.S.D.N.Y. 1990).

13

33. The selection of the Successful Bidder(s) will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process. The Debtor intends to request at the Sale Approval Hearing a finding that the Successful Bidder(s) is a good faith purchaser entitled to the protections of section 363(m) of the United States Bankruptcy Code.

## IV. The Stalking Horse Protections Should Be Approved

34. In connection with the Sale, the Debtor seeks authorization to pay (I) the Termination Fee, and (II) the Expense Reimbursement as defined herein.

35. The United States Court of Appeals for the Second Circuit has approved the use of break-up fees, where warranted, in bankruptcy cases. *See Official Committee of Sub. Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993)(approving break-up fee and expense reimbursement in connection with chapter 11 plan). Specifically, courts in the Second Circuit have held that break-up fees should be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *See Id.* 657.

36. Approval of termination fees and expense reimbursement as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the United States Bankruptcy Code has become recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. *See Id.* Bankruptcy Courts have approved bidding incentives similar to the Stalking Horse Protection under

14

the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's management taken in good faith and in the exercise of honest judgment.

37.  Here, the Stalking Horse Protections meet the "business judgment rule" standard. First, the Termination Fee is fair and reasonable in amount, particularly in view of the efforts that will have to be expended by a Stalking Horse Bidder. Moreover, the Termination Fee may enable the Debtor to secure an adequate floor for the Auction to close under the terms of the Plan. The Debtor may then insist that ompeting bids also permit a closing under the Plan to be higher and otherwise better than the Stalking Horse Bid, a clear benefit to the Debtor's estate.

38.  Second, should the Debtor determine that providing for Expense Reimbursement is necessary, only documented, reasonable costs and expenses will be reimbursed. In sum, the Debtor's ability to offer both the Expense Reimbursement and the Termination Fee will enable them to ensure that the sale of the Debtor's assets to a contractually committed bidder at a price that they believe to be fair and sufficient to close under the Plan while, at the same time, providing the Debtor with the potential of even greater recovery for the estate.

39.  The Debtor submits that the proposed Stalking Horse Protections will not chill bidding, are reasonable, and their availability to the Debtor will enable the Debtor to maximize the value of the estate. Accordingly, the Debtor should be authorized to offer the Stalking Horse Protection as the Debtor deems necessary in its business judgment.

**V.    The Bidding Procedures are Reasonable and Appropriate**

40. The Debtor believes that the Bidding Procedures will ensure that the bidding process will respect to the Auction is fair and reasonable and will yield the maximum value for its estate and creditors.

41. In addition, the Bidding Procedures set deadlines for conducting an Auction and holding a hearing with respect to the sales proposed herein. As set forth above, the Debtor's efforts to close under the Plan without resort to auction process has been unsuccessful to date. The Debtor has sufficient cash flow to prevent a significant deterioration of the estate during the sale process proposed herein. However, under the terms of the Plan and subsequent orders of this Court, the Debtor must sell its real estate in the immediate future.

42. The Debtor feels that a sale process in the manner and on the timetable set forth herein and in the Bidding Procedures will benefit the estate by maximizing the opportunity of the Debtor to close under the Plan. Such a closing will save the estate *tens of millions of dollars* in taxes and environmental remediation costs. These savings will go directly to the creditors of the estate and should significantly enhance the distribution to unsecured creditors. Because the sale process set forth herein and in the Bidding Procedures contemplates the auction sale required by the Plan, approval of this motion will not delay the liquidation of the Debtor's real estate as contemplated by the Plan, if necessary.

WHEREFORE, the Debtor respectfully requests the entry of an order granting the relief requested herein and such other and further relief as is just.

Dated at Greenwich Connecticut this __ day of November 2008.

          BRITESTARR HOMES, INC.

          By: /s/ Melissa Zelen Neier
          Melissa Zelen Neier
          Fed. Bar No.: CT25055
          Ivey, Barnum & O'Mara
          Greenwich, CT 06830
          203-661-6000 Telephone
          203.661.9462 Facsimile
          E-mail: mneier@ibolaw.com